FIRST NATIONAL BANK OF BURLINGTON et al., Appellees, v. JOHN F. WEBER, Auditor, et al., Appellants.

**TAXATION: Bank Stock—Unallowable Change.** The county auditor
1　may not, after the value of bank stock has been computed and the
　tax levied, recompute the value—make a new assessment—and
　change the tax book accordingly.

**CERTIORARI: When Writ Lies—Unauthorized Change in Assessment.**
2　Certiorari will lie to review an unauthorized change by the county
　auditor in an assessment of bank stock.

*Appeal from Des Moines District Court.*—JAMES D. SMYTH,
Judge.

APRIL 3, 1923.

REHEARING DENIED DECEMBER 14, 1923.

THE action in the district court was in certiorari, to test the legality of the action of the auditor in changing the assessment.

The trial court decreed that the alterations in the record in the office of the county auditor and in the county treasurer's office be canceled and expunged, and that the treasurer should collect only the amount of the taxes levied and assessed against appellees as shown by the records before the alterations complained of were made, and taxed the costs against the defendants. Defendants appeal.—*Affirmed.*

*W. E. Jackson* and *Ben P. Poor,* for appellants.

*La Monte Cowles,* for appellees.

PRESTON, C. J.—1.   This case and six others were, by agreement, tried together in the district court, on the record and returns made in this case.   The cases were submitted together in this court, and one opinion will suffice for all seven cases.   The names and amounts are different in the different cases; otherwise, the questions presented in all are substantially the same, except that in one case the value of the real estate is small, while in others it is large.   The taxes and assessments involved are for the year 1920.   Early in that year, the assessor assessed the shares of stock of appellee herein, and the other banks, to the respective stockholders by name, showing the number of shares and the value per share.   This assessment was returned to the city council, sitting as a board of review.   Due notice was given.   At the hearing before the board, the actual value of the shares was fixed at $102.60 per share, the taxable value, 20 per cent, being $20.52 per share.   There were 3,000 shares, and the total actual value thereof was fixed at $307.800, and the taxable value at $61,560. It does not appear just how the board arrived at these amounts, but it would seem, from the bank's statements made to the assessor for tax purposes, that only a portion, if any, of the government bonds held by the banks was deducted.   Such statement shows the total amount of bills, bonds, and other evidences of debt actually owned by the bank on January 1, 1920, to be $2,784,055.23.   This, we take it, includes United States bonds. Attached to the statement is a list of stockholders and the number of shares held by each, and a list of United States government obligations, in the total amount of $284,476.94.   Below the

1. TAXATION:
bank stock:
unallowable
change.

oath and verification of the statement appears, as a third page of the statement, the amount of the capital, surplus, and undivided profits, and value of shares of stock, etc.; but, under the item "less actual value of U. S. government obligations issued since declaration of war with Germany, owned for more than 60 days prior to December 31st," no amount is given. Also, attached to the statement below the verification is a blank paper, referring to taxable value of capital, surplus, and undivided profits, after having deducted United States government securities, under Section 1304, Code Supplemental Supplement, 1915, as amended; but the blank spaces therein are not filled out. Thereafter follows a statement as to capital, surplus, undivided profits, etc.; so that, as stated from the above, we conclude that there was no deduction of government bonds claimed or made.

Appellants assume that the bonds were deducted, and seek to so show by certain calculations of their own. These calculations, as near as we can arrive at it from the record, were made by the auditor, or by someone in his office at his direction, in pencil on the statements of the banks or on the assessor's book, or both. The auditor did not make the changes himself. This was while the books were in the possession and office of the treasurer, as was the action in February. The values so fixed by the board of review were duly certified to the auditor, spread upon his records, the tax levied thereon, and the books made up and turned over to the treasurer. No objection was made, and no appeal from the action of the board was taken by anyone. The books were turned over to the treasurer December 3, 1920. In the latter part of February, the following year, after the decision in the case of *Des Moines Nat. Bank v. Fairweather*, 191 Iowa 1240, the auditor attempted, without notice to appellees, as appellees contend, to make a new and different assessment of the stock of plaintiff bank and the other banks. Appellees contend that such action was illegal, while appellants say that what was done was a correction, authorized by law.

This action in certiorari was begun and the writ issued and served in September, 1921. Thereafter, while the case was pending in the district court, and in October, 1921, the auditor served notice on appellees of his intention to make the same

changes that had previously been made, and did so by attempt-ing to confirm the previous action. There are three or four re-turns and amended returns to the writ, by the defendants, the auditor and the treasurer. In one of such returns, the auditor states that, on September 24, 1921, he notified each stockholder that he proposed to correct the tax lists by increasing the assess-ment, stating in the notice that it is shown by the statement of the bank and by the tax lists that the city council, as a board of review, and its assessor, *omitted* to include, in computing and fixing the value of bank stock, the full value of certain United States bonds shown by the statement of the bank to be owned by it, etc. From this it appears that the auditor was claiming to raise appellee's assessment, both as a correction and as omitted property. From the giving of the notice in September as a basis for the action in October, it would appear that it was then being claimed that there was omitted property, and that the auditor was proceeding under Section 1385-b, Code Supple-ment, 1913. As said, it is difficult to determine from the record just what was being attempted, or what method the county audi-tor or his deputies adopted in attempting to make the new assessment or correction. Under the circumstances, and under our holdings, we think that appellants may not claim that this was omitted property.

The form of the so-called correction of the tax list for 1920, as shown by the amended return of the treasurer, after referring to the list of stockholders in another book, is as follows:

### FIRST NATIONAL BANK.

| Taxable value, Personal. | Total Tax |
|---|---|
| $90,007.07 | $12,961.15 |
| ~~61,560.00~~ | ~~8,864.64~~ |

This raised the taxable value, as fixed by the assessor and the board of review, from $61,560.00 to $90,007.07, and raised the tax from $8,864.64 to $12,961.15. The *Fairweather* case was decided February 12, 1921 (191 Iowa 1240). The change in the records in this case was first made on February 21, 1921, pursuant, as appellants claim, to the direction of the auditor

of state. The direction from the auditor of state is in the form of a letter, dated February 21, 1921, to all county auditors, directing them to correct the tax list for 1920, in accordance with an opinion by the attorney-general, of the same date, to conform with the law, since the Supreme Court decision held as a nullity the act of the legislature allowing deduction from the assessed value of bank stock on account of government bonds. The opinion of the attorney-general is to the effect that, under the decision of the Supreme Court, the amount of government securities held by banks could not be deducted from the assessed value of its bank stock, and that the auditor of state ''should so notify the various county auditors of the state, that there may be no confusion in reference to the assessment for this year'' (1921). The assessment for 1921 was then being made up, but had not been completed. It is contended by appellees that, while appellants claim to have been acting under such direction, the direction was not followed, for that the correction was not made with reference especially to the government bonds; and that, in any event, there was no authority for the changes made by the county auditor. The banks had all made proper statements, as a basis for taxation, and these were considered and acted upon by the assessor and the board of review. The auditor seems to have been of the opinion that the banks were not paying their proper share of taxes. Appellants, in argument, say:

''It was apparent from an inspection of the verified statement furnished by plaintiff to the assessor, as required by law, that the assessment by the assessor and board of review of the shares of stock to the individual stockholders for 1920 was erroneous, and far below the value that should have been placed thereon.''

The auditor claims to have taken the statements made by the banks, as a basis for the changes or corrections; but we do not find anything in the evidence or in the record of the proceedings had, to show that he was attempting to, or that he did, restore any amount previously deducted for government bonds, as directed by the auditor of state.

The auditor testifies:

''In the latter part of February, after the books had been made up, and after we got notice from Des Moines, I figured

the valuation on the different shares of stock, and had them placed on this roll,—or rather, I ordered it done. They took the capital, surplus, and undivided profits, and deducted the real estate, and they have taken the rule of 80 per cent and 25; and that would give you the book value of each share,—taxable value,—$30.02 and a fraction a share: that's the present value. The assessor's book for 1920, kept in the auditor's office, shows a list of corporate stock that was furnished me by the assessor. That list gives the taxable value of the stock at $102.60, that was assessed by the assessor to the individuals at $102.60 per share. The red figures, corrections made by the county auditor, were placed on that list October 6, 1921.

"Q. Then the red figures that you changed didn't represent anything that was already on the list, but was simply a computation of tax, was it? A. A computation of value. Q. I want to know what the red figures represent: the taxable value, as figured by you on October 6th,—is that it? A. That's the correction. The figures were put on the book at the time indicated because they didn't get to it at the time I ordered it done. They were too busy. We got our notice in February, about the 24th, ordered to make the changes, and so we made them at once. After the statements by the banks made to the assessor were filed by the assessor in my office, I or the deputy or clerk in my office, at my direction, placed the lead pencil figures shown on page No. 2 there. They were put there in the latter part of February, 1921. We undertook to correct the assessor's assessment of bank stock to the individual stockholders. At that time, in addition to the corrections made on page 2 of the statement, I made an entry on the assessor's book for the city of Burlington, 1920, that has been introduced in evidence, that reads as follows: 'The above bank assessments were corrected by the county auditor, as ordered by G. C. Haynes, auditor of state, through letter dated March 2, 1921, and February 21, 1921, First National Bank, number of shares 3,000, 80 per cent $360,031.81, one fourth $90,007.07.' We made those changes in February, and later on, on the 6th of October, I entered the same figures in red ink on the assessment rolls that I had heretofore entered on the bank statements and labeled them 'corrections made by the county auditor;' and on

October 6, 1921, we pasted upon page 216 of the assessor's book the following notations: 'October 6, 1921, assessment valuations and taxes on this page set out below confirmed October 6, 1921.'

"Q. In February, was your attention called to the fact that the assessments that came to you from the city of Burlington, its assessor, and from the assessor of Mediapolis, in relation to these bank stocks, were erroneous? A. Yes. I then proceeded to correct the assessments. I ordered the deputies to make the additions to the taxes. They were corrections added to the taxes, and the lead pencil figures appearing upon the returns in columns opposite the names of 'the stockholders were corrections made in pursuance to my orders by my deputies, and I ordered the deputies to correct the tax lists. Q. When you made this correction of your figures on October 6, 1921, you didn't correct them in accordance with this return made by the bank to you? A. We corrected them on the basis of all assessments, the way they had been done in 1920. Q. Where did you get the assessed valuation? You didn't get them from the statements of the bank, did you? A. That came from the assessor. Q. But it wasn't from the statement furnished by the bank? A. No; we put those in there; they never filled that out. Q. Then you took other things into consideration in making this change than the statement that the bank furnished? A. We took only what the assessor assessed the property at, is the only thing we took into consideration. No other consideration existed. Q. You did that in the case of all the banks, did you not? A. We treated them all the same."

The deputy auditor testified:

"In February, the county auditor directed me to make corrections of assessments of shares of stock in the various banks. We first started out to get the taxable value of each share, and then we got the taxable value of the number of shares owned by each stockholder, then we changed the total of the bank—total of the taxes. I wrote up the book which contains the list of stockholders, and made corrections on the treasurer's books. The data I used in setting out the figures placed on these pages I got from the original bank statement,—the name and number of shares; and then the taxable values had been figured by some-

body else, which I copied from the statements; and then I figured the taxes according to the tax district it was in, on the taxable valuation. I did not figure the valuation. The last column, the lead pencil column on the sheet of taxes on this return, I copied into a book. The figures as returned by the bank were put on first; then the corrected figures were just put over the old figures,—the totals; and the corrected total on the treasurer's book agrees with the total on that Book 7. The figures in the last column in pencil (on the banks' statements), the number of shares at so much a share, had been figured out by somebody else. I copied in this book the taxable value of the shares of stock of the various banks in the city and county, as found upon the banks' statements and set out upon the banks' statements in lead pencil memorandum. I did not make these lead pencil figures on the banks' statements; I simply made a copy of what somebody else did. I know who made them. I saw them made. There was a lead pencil memorandum attached to each of the banks' statements, with the exception of one of the banks in Mediapolis, I believe. Mr. Hudgel, I believe, made the pencil figures on the banks' statements.''

The only other witness who testified in the case was Miss Wilson, a clerk in the auditor's office, who testified very briefly as to work done by her at the direction of the first deputy.

The evidence of the auditor and his deputies cannot change the record. He is bound by the record made, and the record does not show an authorized correction. We think that neither the record nor his evidence does.

When the officers of the bank went to the treasurer's office to pay the second installment of the tax assessed to the several stockholders, the treasurer refused to receive the same, claiming that the taxable value of the stock had been increased. Appellees contend that this increase was not made to the individual stockholders, but to the bank in a lump sum, as before shown. This, we think, is not quite the situation, as shown by the record. The actual value of each share of stock was fixed by the assessor and the board of review at $102.60. To illustrate: One stockholder holding 10 shares was assessed $205.20, which is 20 per cent of $1,026. The action of the auditor in October changed this $205.20 to $300.03, as the taxable value,

and so on with the others.   From this it would seem that the
auditor first raised the assessed valuation of the shares of stock
from $61,560 to $90,007.07, then divided the $90,007.07 by
3,000, the number of shares of stock, and this made the $300.03
for 10 shares.  $61,560 divided by 3,000 gives $205.20.  Figuring
another way, $205.20 is 20 per cent of value on the actual value
of $1,026.  The $300.03 is more than 20 per cent; so that the
assessed valuation is more than 20 per cent of the actual value,
or else it was attempted in some way to raise the actual value
of the stock, in order to get $300.03.  The other stockholders
were raised in the same manner.  The amount demanded was the
tax on $90,007.07.  In regard to the real estate owned by the
bank, what appears to have been done by the auditor in the
instant case, was this:   From the total amount of the capital
stock, surplus, and undivided profits shown by the bank's state-
ment, which totaled $450,039.85, the value of the real estate
shown on the bank statement was not deducted, leaving, as the
actual value of capital stock and surplus, $450,039.85, 20 per
cent of which makes $90,007.07, as the net taxable value.  It is
contended by appellees that this action and the result were
erroneous, since the actual value of the real estate, as shown by
the bank statement, went in, to make up the total of the value
of the capital stock and surplus, and that the value of the real
estate should have been deducted, if the auditor were attempting
only, as he states, to correct a mistake in the return.  The value
of the real estate in the instant case is so small as not to require
extended consideration; but it does appear without dispute that,
in others of the cases, the value of the real estate was large,—
in one instance, more than $100,000.  In all the cases, the audi-
tor deducted the assessed valuation of the real estate, and not the
actual value, as required by Section 1322, Code Supplement,
1913.  *Security Sav. Bank v. Board of Review*, 189 Iowa 463.
The deduction of the smaller or assessed valuation, of course,
increased the amount for taxation of the other property.

      We reach the conclusion that the action of the auditor was
not the correction of a clerical error in computation, but rather,
a new assessment.  The effect of his action was to change or
raise the assessment to the amount which, in his judgment, the
assessor and the board of review should have fixed.  We think

his action was unauthorized and illegal. The facts in the instant case are quite different from the facts in others of our recent cases.

2. It is suggested by appellants that the act on the part of the auditor was a ministerial act, and that for that reason, and because his acts were not such an illegality as contemplated by the statute, certiorari will not lie. We have held that the act of the assessor, under the statute as it now stands, in ascertaining the value of bank stock, is ministerial in its nature, and that in that respect he is required to make only an accurate computation. But that is not this case. We have seen that the auditor went further than to make a mere correction or computation. Without discussing the question at length, we think that the action of the county auditor was such an illegality, and that he so exceeded his proper jurisdiction, that certiorari will lie. Code Section 4154.

*2. CERTIORARI: when writ lies: unauthorized change in assessment.*

3. It is thought by appellants that the court erred in rendering a personal judgment against defendants for costs. We do not so interpret the judgment of the court. The action is against defendants in their official capacity, and while the judgment for costs is against the defendants, it is against them as officers, and in their official capacity.

Without further extending the opinion, we think the judgment of the district court ought to be affirmed. It is—*Affirmed.*

EVANS, ARTHUR, FAVILLE, and DE GRAFF, JJ., concur.